178 F.2d 926
 DUNCAN COFFEE CO.
v.
RECONSTRUCTION FINANCE CORPORATION.
 No. 500.
 United States Emergency Court of Appeals.
 Heard at Houston, Texas, September 29, 1949.
 Decided December 16, 1949.
 
 Samuel H. Peak, Houston, Tex., for complainant.
 George Arthur Fruit, Attorney, Department of Justice, Washington, D.C., with whom Joseph M. Friedman, Special Assistant to the Attorney General, was on the brief, and William G. Winters, Jr., Assistant United States Attorney, Houston, Texas, for respondent.
 Before MARIS, Chief Judge, and McALLISTER and LINDLEY, Judges.
 McALLISTER, Judge.
 
 
 1
 Complainant, Duncan Coffee Company, brought suit in this court* to review the denial by respondent, Reconstruction Finance Corporation, of respondent's contractual liability to complainant under a coffee subsidy contract. The liability was determined to be $189,194.64. Complainant admits a liability of $110,135.28, and seeks, therefore, to recover the difference of $79,059.36 from subsidies now withheld from it by the Reconstruction Finance Corporation.
 
 
 2
 An outline of the background of the controversy may serve to clarify the issues. In 1945, coffee was scarce in this country as a result of was conditions; and because of that fact and to secure necessary coffee imports, without increasing prices to consumers above the price ceiling then existing, or resuming coffee rationing, the Director of Economic Stabilization, in accordance with the authority vested in him by law, ordered the Reconstruction Finance Corporation to subsidize coffee imports by paying 3 cents per pound for green coffee imported in accordance with certain prescribed conditions.
 
 
 3
 The purpose of the subsidy was to enable the importers who received it to pay the additional 3 cents per pound to their foreign sources of supply which were demanding such increased prices. The subsidy was paid to importers in this country through contracts which were entered into between the coffee importers and the Reconstruction Finance Corporation. All of the agreements entered into with the various importers were substantially similar in terms, except as to the quantities of coffee to be imported.
 
 
 4
 The contract entered into between the Duncan Coffee Company and the Reconstruction Finance Corporation, which is designated as contract No. 268, was executed November 19, 1945, and according to its terms, respondent agreed to pay the Duncan Coffee Company 3 cents per pound on green coffee purchased for import prior to April 1, 1946, and received in the United States not later than June 30, 1946. A maximum of coffee to be imported was specified of 11,946,580 pounds. In paragraph 13 of the contract, it was provided that its terms could be modified by mutual consent at any time; and that it might be modified or canceled by the Reconstruction Finance Corporation on ten days' notice to complainant. It was also provided that such modification or cancellation, either by both parties or by the Reconstruction Finance Corporation alone, would not affect any rights accrued under the contract prior to modification.
 
 
 5
 The contract was twice amended, in accordance with its terms, by mutual action, but never under the provision permitting modification by respondent alone.
 
 
 6
 The first amendment took place March 19, 1946, and added paragraph 14. This provided for increasing the maximum amount of coffee to be imported by the Duncan Coffee Company by more than 100%; extended the term for purchase of such coffee from March 31, 1946 to June 30, 1946; and added the following paragraph to the coffee subsidy contract: "In the event of an increase in OPA maximum prices on coffee, the importer shall pay to RFC an amount equal to the increase in maximum prices per pound on each type of coffee (not to exceed three cents a pound, green basis) times the number of pounds of each type of coffee which the importer owns in the continental United States at the close of business on the day prior to such increase in maximum prices, less the amount of such coffee which the importer has contracted to sell at a fixed price not to exceed the OPA maximum prices for such coffee in effect April 1, 1946, provided that the total amount of repayment to RFC shall not exceed the amount of payments by RFC to the importer under this agreement as amended."
 
 
 7
 The second amendment occurred on May 7, 1946. It extended the time for the arrival of imported coffee to August 15, 1946; and extended the time for filing claims for subsidies from July 31, 1946 to September 30, 1946. It further amended the contract by modifying paragraph 14 thereof to read as follows:
 
 
 8
 "In the event of an increase in or removal of OPA maximum prices on coffee, the importer shall pay to RFC an amount equal to the equivalent of the increase in value of his inventory, computed as follows:
 
 
 9
 "a. The rate shall be three cents a pound green basis, or the increase in OPA maximum prices, whichever is lower.
 
 
 10
 "b. The inventory shall include all types of coffee, measured in green basis equivalents, at the close of business on the day prior to such increase in or removal of maximum prices, which either the importer owns in the continental United States or for which a bill of lading covering shipment to the United States for the importer's account has been issued in a foreign port; provided that the total inventory shall be reduced by the quantity of such coffee which the importer has contracted to sell at a fixed price not to exceed the OPA maximum prices for such coffee in effect April 1, 1946.
 
 
 11
 "c. The total of repayment to RFC under this paragraph shall not exceed the amount of payments by RFC to the importer under this agreement as amended."
 
 
 12
 On June 30, 1946, the Emergency Price Control Act of 1942, as amended, expired, and OPA prices on coffee ended. On July 25, 1946, maximum prices on coffee were reimposed under the Price Control Extension Act of 1946, at June 30, 1946 levels, and were later increased. The subsidy program was, however, never renewed.
 
 
 13
 Upon the termination of the subsidy program and the increase in the OPA maximum prices on coffee, the Reconstruction Finance Corporation withheld from the Duncan Coffee Company the sum of $189,194.64, calculated on the basis of the Duncan Coffee Company's entire coffee inventory at that time. Of this sum, $110,135.28 was for the green coffee actually imported by the complainant and on which it had been paid subsidies. It is admitted by Duncan that the RFC is entitled to recapture this amount of subsidy under the provisions of paragraph 14, as amended. However, it is contended that respondent has no right to recover the balance of $79,059.36 attributable to that part of Duncan's inventory of coffee which had not been imported by Duncan, but which had been purchased by it in this country from others who had imported it.
 
 
 14
 Emphasizing that it had received no subsidies for the coffee in its possession which had been imported by others, complainant contends that the Reconstruction Finance Corporation is entitled to recapture subsidies related only to coffee acquired by Duncan as an importer, but can not recapture any money for coffee which it had acquired in this country from other importers and which Duncan had purchased only in its role as a roaster of coffee.
 
 
 15
 The Reconstruction Finance Corporation, as has been mentioned, denied the Duncan Coffee Company's protest against the determination that the company was liable, under the subsidy recapture provision of the subsidy contract, on the basis of Duncan's entire inventory of coffee on hand at the time of the increase in OPA prices on coffee.
 
 
 16
 After the denial of its protest, the Duncan Coffee Company instituted an action against respondent in the District Court for the Southern District of Texas. Respondent, contending that by Section 204(d) of the Emergency Price Control Act of 1942, 50 U.S.C.A.Appendix, § 924 (d), the Emergency Court of Appeals is given exclusive jurisdiction of such complaints, contended that the district court lacked jurisdiction; and, on November 15, 1948, the suit was dismissed for that reason on the authority of the decisions in Armour & Co. v. Reconstruction Finance Corporation, Em.App.1947, 162 F.2d 918, and Wm. Schluderberg, T. J. Kurdle Co. v. Reconstruction Finance Corporation, Em.App.1948, 169 F.2d 419. Plaintiff appealed from such dismissal to the Court of Appeals for the Fifth Circuit, and during the pendency of such appeal, filed its complaint in this court.
 
 
 17
 Although the jurisdiction of the Emergency Court of Appeals to decide this case has not been challenged, it seems proper at the outset, because of a certain novel aspect, to determine that question. Under Section 204(d) of the Emergency Price Control Act, it is provided that the "Emergency Court of Appeals * * * shall have exclusive jurisdiction to determine the validity of any regulation or order issued under section 2, of any price schedule effective in accordance with the provisions of section 206, and of any provision of any such regulation, order, or price schedule." In the instant case, no regulation was issued under Section 2 of the Emergency Price Control Act. However, authority for the payment of subsidies is found in Section 2(e) of that statute, and an order relative to the payment or nonpayment of a subsidy would, therefore, be an "order issued under section 2," of which this court has jurisdiction. In this case, the determination of the RFC with respect to complainant's claim for subsidy amounted to an order. The RFC sought to justify such order or determination by its interpretation of the subsidy agreement between the parties. If the respondent's interpretation of the contract was right, the order issued thereupon was valid; if the interpretation was wrong, the order based upon such an interpretation was invalid. Since this court has jurisdiction to determine the validity of an order issued under Section 2 of the Act, it has jurisdiction in this case to construe the subsidy contract in question and determine the validity of the order and determination of the RFC with respect to complainant's claim to subsidy.
 
 
 18
 In its complaint, the Duncan Coffee Company contends that the coffee subsidy contract, and especially the subsidy recapture provision therein contained, should be construed as applying only to the green coffee actually imported by the Duncan Coffee Company during the life of the contract, and not to that coffee which had been imported prior to the inception of the coffee subsidy program, or to coffee purchased by the Duncan Coffee Company from other importers. The Reconstruction Finance Corporation, although conceding that the coffee subsidy contract provided for payment of subsidies to the Duncan Company only on green coffee actually imported by it, nevertheless, denied that the application of the recapture provision was limited to the coffee which the Duncan Company actually imported. Rather, respondent insists that the Duncan Company's entire inventory of green coffee, from whatever source derived, was subject to the provisions of the subsidy recapture clause.
 
 
 19
 The case, then, boils down to the interpretation of the coffee subsidy contract between the parties. Duncan Coffee Company contends that the interpretation that the subsidy recapture provision applies to its entire coffee inventory rather than merely the coffee which it had imported into this country, is contrary to the provisions of Section 2(h) of the Price Control Act, as well as to the purpose of the coffee import subsidy program, and the terms of the contract itself. It further contends that such an interpretation results in an arbitrary discrimination against the Duncan Coffee Company in its status as a roaster.
 
 
 20
 There were in the United States at the time of the subsidy program, a substantial number of roasters who did not import their own supplies of green coffee, but who purchased such supplies from importers. Some importers were also roasters; and some such importers, of which the Duncan Coffee Company was one, purchased part of their green coffee supplies from other importers.
 
 
 21
 Complainant says that since it did not receive subsidies on coffee which it did not import, it should not be subject to recapture of subsidy amounts on its entire inventory, which includes coffee that it imported, as well as coffee that it bought in this country from other importers. It declares that the roaster function of complainant and companies similarly situated was traditionally separate and distinct from the status of importer and so considered by the industry in its entirety; and it is submitted that where the contract refers to the "importer," it means only Duncan Coffee Company in its role as an importer, and not in its role as a roaster.
 
 
 22
 Paragraph 14 of the contract above set forth provides that in the event of an increase in or removal of maximum coffee prices, "the importer" shall pay to RFC an amount equal to the equivalent of the increase in the value of his inventory, computed at a rate of 3 cents a pound for each type of coffee "which the importer owns in the continental United States, at the close of business on the day prior to such increase in maximum prices." The amendment of paragraph 14 provided that the inventory should include "all types of coffee * * * which the importer owns in the continental United States." This is not the language of a regulation of the Reconstruction Finance Corporation, but of a contract. If the language were found in a regulation, the repeated use of the phrase, "the importer," might indicate that the construction urged by complainant, that the language applied to complainant in its capacity as an importer but not as a roaster, would be correct. See Booth Fisheries Corp. v. Bowles, Em.App.1946, 153 F.2d 449; Electromatic Distributors v. Clark, Em.App.1947, 162 F.2d 212. Here, how ever, we are not concerned with the construction of an administrative regulation, but are dealing with the interpretation of a contract and must be guided by the intent of the parties, as expressed therein. The contract itself recites that it is an "agreement * * * between Reconstruction Finance Corporation * * * hereinafter called RFC and Duncan Coffee Co. having its principal place of business at * * * Houston, Texas hereinafter called the `Importer.'" This appears to be a clear, unambiguous expression of the parties' intention that the word "Importer," whenever it appeared in the body of the contract, should mean "Duncan Coffee Company" and nowhere in the contract does there appear any provision which lends support to complainant's contention that the word should be construed to mean "Duncan Coffee Company in its status as importer." If we substitute "Duncan Coffee Company" for "Importer," wherever it appears in paragraph 14, it is evident that respondent's interpretation of the recapture clause — that it applied to all the green coffee owned by the Duncan Coffee Company at the termination of the coffee subsidy program — is correct. To construe it as complainant urges would be to rewrite the agreement of the parties.
 
 
 23
 Complainant contends that such an interpretation is contrary to the provisions of Section 2(h) of the Price Control Act, which provides that the powers granted therein shall not be used to compel changes in the business practices or methods of distribution established in any industry, except upon an affirmative finding of necessity, and that the above mentioned interpretation results in discrimination against complainant in its status as a roaster inasmuch as competing roasters were not subject to any "recapture prejudice." The answer to this is found in the contractual nature of the document being interpreted. If there has been any change in complainant's customary business practices, and if complainant, in its roaster status, has been placed at a competitive disadvantage, it consented, in legal effect, to these changes when it signed the contract with respondent. While complainant denies that it ever consented to the interpretation placed on the contract by respondent, nevertheless, it adopted the language from which that interpretation logically flows.
 
 
 24
 Complainant advances the further contention that because of the provision in paragraph 13(a) that no modification of the contract should affect any rights which accrued thereunder prior to such modification, the subsidies earned by it prior to the amendment of paragraph 14 are not subject to recapture, regardless of the interpretation placed upon the language used in that paragraph. However, the subsidy recapture provision of paragraph 14 had no retroactive effect. It operated in a wholly prospective fashion. It provided that in the event of an increase in or removal of maximum prices on coffee, the importer would pay to RFC an amount equal to the equivalent of the "increase in value of his inventory," as it existed at that time, rather than at some past date. The only reference to a prior period in the subsidy recapture provision of paragraph 14, is found in that part of the paragraph which limited the amount to be repaid by the importer to the RFC, to the sum which had been received by the importer in the form of subsidy payments under the contract. Moreover, the provision for modification in paragraph 13 set forth that "Except as provided in paragraph 6 above," the terms of the contract might be modified by mutual consent, and "such modification or cancellation shall not affect any rights accrued under this agreement prior to such modification." Paragraph 6 of the contract above mentioned related to the amount of coffee covered by the agreement and provided that the maximum quantity set out in paragraph 2 of the contract should be subject to change on written certification of a different quantity to RFC by the Department of Agriculture. It further provided that such change should not be retroactive so as to cut off any rights accrued under the agreement. Paragraph 2, to which reference was thus made in Paragraph 6, and Paragraph 3 of the contract, stipulated that the RFC would pay the importer 3 cents a pound on the claims for coffee covered in the agreement, provided that the importer had purchased and loaded the coffee on board a carrier between certain dates or had booked shipping space for its shipment and had the coffee in the foreign port ready for shipment before a designated date. Reading paragraph 13 in the light of the various other paragraphs bound to each other by a chain of express reference, leads to the conclusion that the protection stipulated in the contract against subsequent modification affecting accrued rights related only to subsequent downward modifications of the maximum quantity of coffee covered, to which complainant had already agreed in paragraph 6 of the contract. It may also be observed that both amendments to the contract substantially modified, to complainant's advantage, the rights of complainant which had been previously agreed upon. From the foregoing, we conclude that the recapture provisions of paragraph 14 are not within the prohibition of paragraph 13 stipulating against modifications of the contract affecting accrued rights. Moreover, it is not shown where there was any purpose in this case to change existing business practices. No provision of the contract required any changes; and no such instances have been alleged.
 
 
 25
 Complainant charges that it suffered discrimination by virtue of the fact that other roasters who had not imported coffee had been able to buy their supplies of coffee from importers without being called upon to repay amounts on such coffee. Alleging that in its role as roaster, it should not be subjected to a greater competitive disadvantage than nonimporting roasters, complainant contends that the subsidy agreement, as interpreted by the RFC, was unfair, discriminatory, and invalid. The Commissioner of the Office of Temporary Controls, in reviewing complainant's objections to the operation of the subsidy recapture clause of paragraph 14 of the contract, observed that "The termination of the wartime subsidy programs has tended to work to the greater advantage of some groups than of others. Although this situation is to be regretted, there seems to be no means of avoiding it, given the wide variety of circumstances which our directives must cover." Such a view and conclusion as above expressed cannot be said to be unreasonable or result in such discrimination as to invalidate the subsidy contract provisions in question.
 
 
 26
 In accordance with the foregoing, a judgment will be entered dismissing the complaint.
 
 
 
 Notes:
 
 
 *
 Section 204(a) of the Emergency Price Control Act of 1942, as amended, 50 U.S.C.A.Appendix, § 924(a)